George MAULDIN;  and Joyce
Mauldin, Appellants,

v.

Rebecca BEARDEN, Appellee.

No.  2008–SC–000557–DGE.

Supreme Court of Kentucky.

Aug. 27, 2009.

Mitchell A. Charney, Stephanie Lynn Morgan–White, Goldberg & Simpson PSC, Prospect, KY, Counsel for Appellants.

Armand I. Judah, Judah–McLeod PLLC, Louisville, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellants, George and Joyce Mauldin, are the paternal grandparents of O.M., who is a minor. The Appellee, Rebecca Bearden, is the birth mother of O.M. Through a series of events which will be discussed more fully hereafter, the Appellants were given permanent custody of O.M. Subsequently, Appellee moved to have that order set aside pursuant to CR 60.02(d) and (f), alleging fraud in the earlier proceedings. The Court of Appeals reversed and remanded, finding that the Appellee had made sufficient allegations of fraud and that the trial court had improperly declined to exercise jurisdiction over the matter. Because we believe the trial court properly exercised its discretion as to both matters, the Court of Appeals is reversed, and the judgment of the trial court is reinstated.

## I. Background

The record reveals that O.M. was born to Appellee and her then husband Christoper Mauldin on December 21, 2005. Both Christopher Mauldin and the Appellee were admitted alcoholics and drank excessively. They also, possibly because of the drinking, were physically abusive to each other. The dependency, neglect and abuse petition that was eventually filed in this case alleged that Appellee twice tested at the legal limit for alcohol at a doctor's visit during the pregnancy, and continued to drink while breastfeeding the newborn infant. At the time, Appellee had two other children who lived with their birth father, and had only supervised visits with them. She had a conviction for alcohol intoxication in a public place on August 8, 2005, and an active bench warrant from July of that year for operating a motor vehicle under the influence of alcohol or drugs. Obviously, she was pregnant at the time of both offenses, because O.M. was born in December 2005.

Four days after the birth, the police were called to Christopher and Appellee's home, where O.M. was present. This event was quickly followed by the Appellants filing a petition for temporary and permanent custody of O.M. on December 29, 2005. They also filed an *ex parte* emergency motion for temporary custody, which was granted. A hearing was held shortly thereafter, at which the family court granted Appellants temporary custody and referred the case to the Cabinet for Health and Family Services (CHFS) to investigate. The Appellants were supported in their motion by the maternal grandparents, who stated through an affidavit that Christopher and their daughter were "unfit and unable" to properly care for O.M., that the parents were alcoholics and violent, and that their home was "unsanitary, in disarray, and unsuitable for a child." They expressed their concern about the possibility of the child being left "in this dangerous and unsuitable environment." The child was immediately taken to Alabama, the home of Appellants and has remained there since.

After its investigation, CHFS filed a dependency, neglect and abuse (DNA) petition. Though it was originally assigned to a different division of the Jefferson Family

Court, the DNA action was transferred to the same division as the custody action (Jefferson Family Court, Division 9) consistent with the principle of "one family, one judge" which underlies Family Court. Consequently, the same judge presided in both tracks of the legal actions involving O.M., though it should be noted that they originally were and continued to be treated to some degree as separate actions, complete with different case names and numbers.[1]

At the first DNA hearing, Christopher and Appellee both came to court under the influence, and were both arrested and taken into custody. This arrest resulted in the execution of a pending active warrant for Appellee's arrest. The family court also reaffirmed the grant of temporary custody to the Appellants.

In a subsequent hearing on May 10, 2006, both Christopher and Appellee were ordered to participate in counseling for alcohol and domestic violence, to complete dependency treatment, to submit to random drug testing, and to take parenting classes. The family court also ordered supervised visitation for both parents, though neither ever exercised that right.

Throughout this time, neither Christopher nor Appellee filed a responsive pleading to the petition for permanent custody that was pending. On June 22, 2006, Appellants filed a motion asking the family court to enter a default judgment granting them permanent custody, as O.M. was now seven months old, had little or no contact with her parents, and would be best served by permanency. Both parents were given notice of the hearing, as were the maternal grandparents. When the original hearing date of June 28, 2006 had to be reschedule-

uled, the same parties were notified of the new date of August 18, 2006. Although the parents had not seen O.M. since she was taken to Alabama, neither Christopher nor Appellee filed a response or appeared at the hearing. The family court entered a default judgment granting permanent custody to the Appellants. The supervised visitation order from the DNA proceeding remained in effect, but no further action was being pursued by the Cabinet at that time, so there was no termination of parental rights that would prevent the ordered visitation. Appellee and Christopher were still living together, and did not separate until November 25, 2006.

On December 5, 2006, the Appellants, as the custodians of O.M., filed a petition for adoption in Alabama, then the home state of the child. O.M. had been living with her grandparents in that state for nearly a year. The Alabama court entered an interlocutory decree granting custody to the Appellants under the statutory scheme of that state and set a dispositional hearing on the adoption for March 27, 2007. Christopher and Appellee were given notice of the hearing.

Appellee retained counsel and participated in the Alabama adoption proceeding. Nonetheless, on April 3, 2007, Appellee filed a motion with the Jefferson Family Court under the case numbers for both the custody and DNA proceeding, but noticed only for the DNA docket, asking that the court grant custody of O.M. back to her. The family court denied her motion as improper on a DNA docket.

Then on May 25, 2007, instead of filing a motion to amend custody and giving notice for the custody docket, Appellant filed a

1. The custody action was styled, "George Mauldin, and his wife, *Joyce Mauldin v. Christopher B. Mauldin and Rebecca Bearden Mauldin,"* and its case number was 05–CI–504729.

The DNA action was styled "In the interest of [O.M.]," and its case number was 06–J–500006–001.

motion without a supporting memorandum pursuant to CR 60.02(d) and (f), asking the court to set aside the August 18, 2006 judgment and to set a custody hearing. This bare motion was supported only by three affidavits: one from Appellee, one from Christopher, and one from the maternal grandparents.

Appellee's affidavit stated that she had been prevented from participating in the permanent custody hearing because of abuse and threats from Christopher and lack of access to a vehicle or phone, and that she believed the Appellants were in league with Christopher to prevent her from appearing to defend against permanent custody. She stated that but for the domestic violence, she would have appeared in court and defended herself, but she did not state what that defense would have been. Christopher, then living in California, admitted the abuse, implied that his parents had bribed him with money, and stated that they conspired with him to keep Appellee from appearing. The maternal grandparents, despite their earlier affidavit supporting Appellants, said that Appellee was now "capable of having the care, custody and control of her child."

Appellants responded with rebuttal affidavits, and the family court set a hearing on the motion for July 27, 2007. Appellee and the Appellants appeared with counsel, and the court heard the arguments of counsel. Christopher did not appear. The court did not take further testimony from the parties, but did take the matter under submission for a review of the record. On August 1, 2007, the court entered an order denying the motion, noting that both Christopher and Appellee had stipulated in the DNA proceeding that O.M. was at risk of neglect because of their excessive use of alcohol. Further, the court chronicled the notice the parents had received prior to the default judgment hearing. It stated that Appellee had not alleged fraud or improper conduct by Appellants, or that they collaborated with Christopher. This may have been technically correct, but Christopher had made such allegations on her behalf in his affidavit. The court also agreed that it had jurisdiction. The court did definitively find that "[t]he Petitioners have not done anything improper to obtain permanent custody of [O.M.]" It determined there was therefore no basis to set the judgment aside pursuant to CR 60.02, and denied the motion on August 2, 2007.

Appellee then filed a motion to alter, amend or vacate on August 9, 2007 simply disagreeing with the court's decision; she also filed a motion for visitation. On August 31, 2007, the court denied her motions, specifically declining to exercise jurisdiction and instead deferring to Alabama as the home state of the child, but indicating that since there was a visitation order in place, visitation could be pursued under that order in Alabama in the adoption proceeding.

Appellee appealed. Christopher did not join the appeal, and he was not named as a party by Appellee. The Court of Appeals reversed, vacated, and remanded the case to the family court, opining that the affidavits submitted by Appellee alleged facts, which if true, demonstrated fraud and would thus justify vacating the judgment, and that the trial court was required to hold a full evidentiary hearing, including testimony rather than affidavits. The Court of Appeals also concluded that the family court had continuing jurisdiction under KRS 403.824, but did not discuss the fact that the trial court had expressly declined jurisdiction.

Appellants then sought discretionary review with this Court, which was granted to clarify the application of CR 60.02(d) and (f), and KRS 403.824.

## II. Analysis

■ Despite the painful odyssey which led to this point, only two issues are raised in this appeal: Did the family court, under the facts of this case, properly deny Appellee's CR 60.02 motion without conducting a full evidentiary hearing on allegations of fraud? And, does the family court have continuing, *exclusive* jurisdiction such that it must make decisions regarding visitation?

### A. CR 60.02(d) and (f)

"Upon such terms as are just," a court may set aside its judgment pursuant to CR 60.02(d) and (f), respectively, for "fraud affecting the proceedings," or for "any other reason of an extraordinary nature justifying relief." However, because this rule can affect the finality of judgments, it should be invoked only with extreme caution and under unusual circumstances. *Cawood v. Cawood*, 329 S.W.2d 569 (Ky. 1959).

Appellee claims, through the affidavits supporting her motion to have the judgment of permanent custody to Appellants set aside, that her husband, Christopher, and his parents, Appellants, conspired to prevent her from making a defense. As such, she views this as an extrinsic fraud upon the court or an extraordinary reason, which requires that custody be determined *de novo*. The affidavits reveal serious allegations, including a threat to her life and continued physical abuse if she attempted to appear at the hearing on permanent custody. They also imply (as in her affidavit) or actually state (as in Christopher's affidavit) that Christopher and his parents "worked together to prevent Rebecca from having any type of defense or from filing a response or from doing anything which would normally be done to protect herself in a custody case." Indeed, should a court find that the Appellee was beaten, denied transportation or access to a phone, and placed in fear for her life in order to keep her away from court, a finding of fraud in the proceedings might be mandated. However, these claims were vigorously disputed by the Appellants.

In addition, the family court had the benefit of the record from the DNA proceedings and the two custody hearings, and doubtless could not forget that it had both parents arrested for appearing in court under the influence of alcohol. The question is, given what the judge had from the affidavits, the record, and what he knew from presiding in the case, did he have sufficient information to determine the facts and judge the credibility of the parties?

■ The Court of Appeals believed that once Appellee raised questions about domestic violence and fraud, even though rebutted by the Appellants, the family court was obliged to take further testimony—a full evidentiary hearing. Under the facts of this case, that was not required. The affidavits made it abundantly clear what acts of fraud were being alleged. The family court was well within its discretion to take the allegations on their face, and determine if further proof was necessary. The specificity of the fraud allegations in the affidavits could have been fleshed out by further testimony but would not be fundamentally changed by that testimony. Indeed, the only witnesses who could testify that Appellants and Christopher colluded to keep Appellee from defending herself were the Appellants and Christopher. Appellants had already submitted affidavits denying this. Christopher, who had moved to California, certainly was suspect in his motivation. The family court knew from the record and having presided that Christopher was bitter toward his parents because of the emergency custody motion. Appellee her-

self could only state that she "believes" there was fraud, as she was unable to make any claims that she witnessed the Appellants attempting to keep her from defending herself.

One of the primary benefits of Family Court is that the same judge presides in all domestic court matters affecting that family. Because of this model, the family court had several contacts with all the parties, heard testimony and arguments during the earlier proceedings, and had available the entire record and exhibits relating to these parties. The court's decision not to take additional testimony was grounded in what it already knew from previous court proceedings, and as the trier of fact, it was certainly in the best position to judge the credibility of all the parties involved. Additionally, as a policy matter, the court's decision spared these families the turmoil that would be caused by accusatory testimony that would be redundant to the claims made, but would doubtlessly increase rancor and make it far more difficult to further any relationship between Appellee and her daughter in the future.

However, there are additional reasons why the family court was correct in this case. First, Appellee never appealed the family court's permanent custody decision. CR 60.02 is neither a substitute for, nor a separate avenue of, appeal. Its purpose is only to raise issues which cannot be raised in other proceedings, and therefore a movant must show that she is entitled to extraordinary relief. *McQueen v. Commonwealth,* 948 S.W.2d 415 (Ky.1997). In this regard, the family court must look to the time and circumstances of the judgment the movant wishes to set aside. The present circumstances of the movant are not relevant unless the judgment is actually set aside and a *de novo* custody hearing is held. Instead, claims of fraud or for extraordinary relief must be based on factors that existed at the time of the judgment. In this case, the question is not whether Appellee was subjectively prevented from defending herself, but whether any defense she had could have been made at the time of the family court's final order granting permanent custody to the Appellants.

There is evidence in the record that Appellee was not totally without resources at the time the family court entered the permanent custody order, and certainly she was entitled to protection from Christopher had she sought it. This Court acknowledges that often victims of domestic violence do not believe they can escape their abuser, but the legislature and the courts have made significant provisions to assist them. It is equally likely that her state of addiction caused her inaction. Both abuse and addiction are factors that are proper for a court to consider, but standing alone, they do not equal fraud or facts of an "extraordinary nature" sufficient under CR 60.02.

■ But more importantly, Appellant failed to demonstrate she would have had a defense in the custody proceeding. There are "two necessary grounds upon which the court may have been authorized to vacate the judgment, namely, (1) fraud and circumvention of the prevailing party which prevented a defense being presented, and (2) that the defendant *had and has a meritorious defense to the action.*" *Rice v. Dowell,* 322 S.W.2d 468 (Ky.1959) (emphasis added) (internal citations omitted). In addition to specific acts of fraud, a movant "must both allege and prove ... the defense he could or would have interposed to defeat the rendition of the judgment had he not been prevented from doing so by the fraud." *Dawson v. Clelland,* 252 S.W.2d 694 (Ky.1952). The movant may not himself be negligent or the cause of his inaction and must make a

*prima facie* showing that he has a valid defense. *Overstreet v. Grinstead's Adm'r,* 283 Ky. 73, 140 S.W.2d 836 (1940).

Even if Appellee did establish that Christopher and his parents colluded to deny her a defense, she would still have to make a prima facie showing that she had a defense at the time of the custody proceeding that could have reasonably prevented the family court from granting permanent custody to the Appellants. Given the evidence in the record, there is little likelihood that the family court would have ruled otherwise. With her admissions at the time and the investigative proof offered by the Cabinet, what evidence would support denying permanent custody other than a sincerely expressed preference for temporary custody and suggestion of a possibility that she would eventually be able to parent, when she had exercised no visitation with her child? Certainly, it would have been within the family court's discretion to continue temporary custody rather than award permanent custody on that day, but it likewise had discretion to consider all it knew about her condition, her inability to parent, and the dangerous dynamic between her and Christopher, with whom she was still living at the time. It would not have been an abuse of discretion had the court done so after hearing her defense.

Appellee's fatal mistake, however, is that she did not make a statement of any kind as to what her defense at the time would have been, let alone make a *prima facie* factual showing, in her motion and affidavits under CR 60.02. Having given the court no indication of a viable defense available to her at the time of the permanent custody hearing, her motion was de-

fective on its face, and she was not entitled to a hearing, much less a "full evidentiary hearing." The family court thus did not abuse its discretion in denying her CR 60.02 motion.

### B. Continuing Jurisdiction

■ The Jefferson Family Court had jurisdiction over actions concerning the child in this case because she was born in Kentucky and had resided here with her parents the entire eight days of her life at the time this action was filed. However, the family court did make significant procedural errors in granting custody to Appellants.

The Appellants began by filing a petition for custody under KRS Chapter 403, which addresses dissolution of marriage and child custody. The petition cited as grounds for jurisdiction KRS 403.828(1),[2] which provides for "temporary emergency jurisdiction if the child is present in this state." Their petition also stated it was filed pursuant to KRS 403.270 and KRS 405.020.

However, these statutes do not apply to the Appellants' position at that time. KRS 403.270 applies to parents and de facto custodians. KRS 405.020 applies to the father or the mother and de facto custodians. KRS 403.828 is a part of Kentucky's adoption of the UCCJEA, and applies to children who are not Kentucky residents who have been brought into this state under an emergency basis, and is designed to grant *jurisdiction* to Kentucky courts where some other state has jurisdiction over the child but is not exercising it. Orders from the Kentucky court remain in effect until the child's home state enters an order regarding the child. If none is entered, this allows Kentucky to become the

---

**2.** They originally filed a petition citing KRS 403.420, which was part of the now repealed UCCJA. See 2004 Ky. Acts ch. 133, § 46 (repealing the UCCJA, effective July 13, 2004). That statute had been repealed for almost a year and a half when the initial petition was filed. Appellants later filed an amended petition citing the current statute.

child's home state and the Kentucky order becomes a final determination.

Though the trial court properly had jurisdiction over the child as a Kentucky resident, the Appellants had no standing to seek custody the way they did. The portions of Chapter 403 on which they rely provide that only a father, mother or de facto custodian can be granted custody under this chapter. The Appellants, obviously not the father or mother, also did not qualify as de facto custodians because the child, being only eight days old, had not resided with them nor been supported by them for "a period of six months or more" as required by KRS 403.270. Thus Appellants had no standing at that time to bring a custody action under Chapter 403. Nevertheless, the family court proceeded to grant "temporary emergency custody".

KRS 403.828 simply does not apply to the facts of this case. It was Appellants who were the residents of another state, not the child. The family court did not need to be given temporary emergency jurisdiction over this child: it already had it. Arguably, the *ex parte* motion for temporary custody could be construed as having initiated a proceeding under KRS 620.060 for an emergency custody order. Indeed, the family court did ultimately refer the case to the Cabinet after the "emergency temporary custody order" was entered, and a separate case file was established on the DNA docket. Under KRS 620.060, an emergency custody order may be issued by the Court *ex parte* when removal of a child from his or her parents is warranted because the child is endangered. A DNA petition may be filed "by any interested person," (KRS 620.070(1)), which would certainly include an abused child's grandparents. Presumably an emergency motion under KRS 620.060 may also be filed by any such person because such a motion leads to a full DNA petition and only requires that "it appear[ ] to the court," KRS 620.060(1), that the child is in danger, meaning that the facts need only be brought to the court's attention. Also, in an emergency proceeding under that chapter, "[c]ustody may be placed with a relative," KRS 620.060(2), meaning placement with the Appellants was not inappropriate. Thus, had the motion been treated as one under this statute, the family court would have proceeded properly, at least initially.

The problem under the facts of this case, even assuming that the family court treated the *ex parte* motion as one under KRS 620.060, is that an order under that statute can be effective for only 72 hours, and a temporary removal hearing, with full notice to both parents, must also be held within those 72 hours. That did not occur here because neither requirement was met. Although the case was later referred to the Cabinet, that did not occur until more than a week later. Thus the initial temporary emergency custody order expired after 72 hours. Later, in the DNA hearing, the family court "renewed" its temporary custody order and ordered supervised visitation for the parents. It was only at that time that legal custody was fully vested in Appellants, and only through the DNA docket. In August of 2006, Appellants then filed a motion in the Chapter 403 proceeding seeking permanent custody by default which was granted. However, Appellee's parental rights had not been terminated, and there was still a visitation order in effect from the DNA proceeding.

But when Appellee later sought to modify the custody orders, effectively filing only in the DNA action, since she only gave notice of her motion in that action, the family court refused to hear her motion. Believing that any custody motion had to be filed in the Chapter 403 proceed-

ing, the court told Appellee that she must proceed in that action.

Appellee then complicated matters by filing a CR 60.02 motion instead of a motion for change of custody in the Chapter 403 action, and a motion for visitation, though one was already in place from the DNA action.

This highlights a number of ongoing problems with family court jurisprudence created by holding separate dockets dealing with the same subject, custody in this case. The family courts have jurisdiction over both Chapter 403 (custody and visitation) and 620 (dependency, neglect, and abuse). And, creditably, the court in this case recognized the interrelatedness of the custody and DNA proceedings sufficiently to require that both be heard by the same judge. But it continued to hold separate, parallel proceedings. It makes little sense, however, to continue to treat this subject matter as separate actions, if the purpose of the family court system is "one family, one judge."

The family court was well aware that it had jurisdiction over the custody of this child. It was also cognizant that it could enter an emergency custody order to any interested person when a child is endangered. But because this action proceeded on a custody/visitation docket (Chapter 403) instead of the DNA docket (Chapter 620), important due process statutory steps were missed: no temporary removal hearing was held within 72 hours, which resulted in the Appellants having custody of the child under a lapsed order until temporary custody was again granted at a later DNA hearing. The valid temporary custody order came from one docket, and the permanent custody order later came from another. Appellee had the right to seek custody of her child, and it should not have mattered that she filed it on the DNA docket instead of the custody docket.

While the circumstances may limit when the court's jurisdiction may be invoked, the type of proceedings available, and the category of people having standing to bring an action, once a legitimate party properly invokes the court's jurisdiction (under the standards of notice pleading), continued compartmentalization of the proceedings—before the same judge—works only to disadvantage some litigants without a sound reason for doing so. When a family court is involved, custody is a single issue, subject to several different statutory schemes. So long as a family court is acting within its statutory authority, it makes little difference what docket is involved. But using separate dockets for the same parties on the same issue can easily cause some statutory requirements to be overlooked. Family court procedures are an evolving matter, as these courts are still very new, and cases such as this one can help this Court and the trial courts refine how these very important cases must be processed.

However, this case does not turn on these problems. By the time the Alabama court took adoption jurisdiction, the child had been living there for almost a year. When the Appellants took the child to Alabama, they acted under color of court orders granting them first temporary custody and later permanent custody. This did not cut off the Kentucky family court's jurisdiction, which it retained as the child's initial home state until some other state took proper jurisdiction of the child.

Here, the family court acknowledged that at the time of the CR 60.02 motion, the child lived in Alabama, that Alabama was now legally her home state, and that an adoption action concerning the child was being litigated in Alabama. The court found that as to visitation, "the matter should be pursued in that action." The family court had given Appellants permanent custody of the child, but since Appel-

lee's parental rights had not been terminated, and since modification of custody and visitation rights remained available, this case would not lose its pending status until the child was emancipated.

The effect of this is that if Alabama or some other state wished to exercise jurisdiction over the child for purposes of custody or visitation, it would be subject to the terms and provisions of the UCCJEA, which universally requires that the new state may not do so unless the Kentucky family court determines that the new state would be a more convenient forum. (KRS 403.826 sets forth these provisions when Kentucky is seeking to assume such jurisdiction.) That is precisely what the family court did in this case, pursuant to KRS 403.834 in regard to the open visitation question, and custody modification questions, which it said could be decided in the Alabama adoption proceedings.

The version of the UCCJEA adopted by both Kentucky and Alabama provides that it does "not govern an adoption proceeding. . . ." KRS 403.802; Ala.Code § 30–3B–103. Thus, even if the trial court had not found forum non conveniens, it could not affect the Alabama adoption proceeding, which also has jurisdiction over custody issues during the pendency of the proceeding. *See* Ala.Code § 26–10A–18. Thus despite the circuitous route taken to get there, the family court correctly deferred to the Alabama court, and did not abuse its discretion.

### III. Conclusion

Because the trial court did not abuse its discretion in either the CR 60.02 proceedings or on the visitation issue, the decision of the Court of Appeals is reversed, and the judgment of the trial court is reinstated.

ABRAMSON, CUNNINGHAM, SCHRODER, SCOTT and VENTERS, JJ., concur. MINTON, C.J., concurs in result only.