Linda WILLIAMS, Appellant

v.

David FRYMIRE, Appellees.

No. 2011–CA–001568–ME.

Court of Appeals of Kentucky.

Aug. 31, 2012.

John H. Helmers, Jr., Troy DeMuth, Louisville, KY, for appellant.

Michael M. Pitman, Murray, KY, for appellee.

Before CAPERTON, LAMBERT, and NICKELL, Judges.

*OPINION*

LAMBERT, Judge:

Linda Williams has appealed from the judgment of the Calloway Family Court

modifying custody of her minor daughter, Jessica Frymire, from sole to joint and naming Linda's former husband and Jessica's father, David Frymire, as the primary residential parent. Linda contends that the court did not have jurisdiction to consider David's motion to modify, and if the forum was appropriate, abused its discretion in modifying the primary residential parent. Based upon our review of the record, including the modification hearing, we disagree with Linda's arguments and therefore affirm.

Linda Williams and David Frymire were married twice; first from 1992 to 1996, and they married for a second time on March 9, 2000. One child, Jessica, was born of the second marriage on September 29, 2005. Linda and David separated in March 2006, and Linda filed a petition to dissolve the marriage the same month. At that time, the couple lived in Lexington and the petition was filed in Fayette County. When David failed to appear at the final hearing regarding custody of Jessica, the Fayette Family Court awarded sole custody to Linda and ordered David to pay child support in the amount of $500.00 per month. The final decree was entered in January 2007.

Following the breakup of their marriage, Linda moved to Woodford County with Jessica and David moved to Calloway County. Linda, through the Fayette County Attorney's Office, moved to transfer the matter to Woodford County, where she and Jessica lived. This was granted in November 2007. In July 2010, Linda, through the Woodford County Attorney's Office, moved to change the venue again, this time to Calloway County. By this time, Linda and Jessica had moved out-of-state and were living in St. Charles, Missouri, while David remained in Calloway County. This motion was granted in August 2010.

On January 3, 2011, David filed a motion in the Calloway Family Court requesting modification of custody or timesharing, for modification of child support, and for restricted visitation. At this time, Jessica was five years old. The basis for David's motion was Linda's e-mail communication sent on November 29, 2010, in which she announced that Jessica was transgender and would from then on be considered a boy, wear boy clothing, and be called Bridge. Linda also stated that she would begin transitioning Jessica's gender from girl to boy and had discussed the matter with Jessica's school. Furthermore, Linda would not listen to any challenge regarding this decision, but referred any dissention to her father. In the motion, David also notified the court of Linda's past behavior regarding Jessica's health, when she raised what were later determined to be unfounded concerns about her vision, hearing, and speech, and her suspicion that Jessica might have Asperger's Syndrome. By separate motion, David requested the appointment of a child psychologist and a custodial evaluation, which the family court granted.

In response, Linda contested the family court's jurisdiction to hear the case because she and Jessica had moved out of the state in 2007 and no longer had any significant connection to Kentucky. She also argued that Kentucky was an inconvenient forum to hear the case. In support, Linda cited to Kentucky Revised Statutes (KRS) 403.824 and 403.834(2).

The court denied Linda's request for a hearing and considered the jurisdictional issue on the basis of the parties' briefs. By order entered March 10, 2011, the family court concluded that Kentucky retained exclusive and continuing jurisdiction of the matter pursuant to KRS 403.824 in that David was a resident of Kentucky. The court also determined that Kentucky was

not an inconvenient forum to address custody modification. Linda moved to alter, amend, or vacate the court's order, stating that the court had failed to address the specific factors listed in KRS 403.834 related to the inconvenient forum issue. The court amended its order to reflect that it had considered the factors set forth in KRS 403.834(2), but otherwise did not alter its ruling.

The family court held a modification hearing on August 3 and 4, 2011. At the beginning of the hearing, the parties stipulated to joint custody and standard visitation, with each party requesting to be the residential parent, although the court later indicated that it would award whatever type of custody that would be in Jessica's best interest. The parties also provided a joint exhibit including a tabbed and indexed set of medical records that would be introduced during the trial. The witnesses testified as follows:

At the time of the hearing, David was forty-four years old. He had been living in Murray, Kentucky, for the past four years and working at Lowes, where he had also worked while he lived in Lexington. Following their separation, he testified that Linda and Jessica moved to Versailles and stayed with former neighbors. Later, she and Jessica moved to Illinois and then to St. Charles, Missouri. He visited one time per month with Jessica, generally in Murray, but Jessica was also able to visit with his sister and his parents (her aunt and grandparents). During their time together, he and Jessica went to the park, played with animals, played baseball, and enjoyed nature. He kept her for five weeks during the summer of 2011, and he stated that she was comfortable and well-settled in his care. David did not encounter any problems with Jessica related to tantrums or depression. He did note that when she arrived, Linda had only packed boy clothes for Jessica to wear.

Regarding the onset of Linda's belief that Jessica is transgender, David recalled a telephone conversation with Linda in May 2010 after Linda had watched a television special on the topic. David assumed this belief would eventually "run its course" like other concerns she had raised in the past related to Jessica's hearing, vision, and speech, and her suspicion of Asperger's Syndrome. David testified that Linda has bipolar disorder, and stated that he believed the medications she took to treat this illness had affected her ability to drive and make decisions.

On cross-examination, David testified about his visitation following their separation and divorce, which he described as increasing over time, and he stated that he never talked to any of the therapists involved. He also admitted that Linda had signed a release permitting him to seek medical assistance for Jessica, if needed. In addition, David stated that he was open to permitting Jessica to wear gender-neutral clothing. The court questioned David regarding his failure to appear at the final custody hearing and whether he had concerns about Linda's ability to care for their daughter. He claimed confusion about the court date, but asked his attorney at the time to represent his interests at the hearing. David testified that he believed Jessica was safe during the time following the separation and divorce.

Betsy Porter, David's sister and Jessica's aunt, testified that she has seen David and Jessica interact, and that Jessica is comfortable, secure, and well cared for while with David. Ms. Porter testified that she had taken care of Jessica at various times during her life, including keeping her for a week when Jessica was two or three weeks old to help Linda cope. She also testified that she had kept Jessica

for a week during the summer of 2010. For this visit, Linda had only packed boy clothes. Ms. Porter took Jessica shopping for comfortable girl clothes, including white denim capri pants and a purple shirt, which Jessica wore during the visit. She also testified that Jessica played like a girl, but that she was not a "girly" girl as she did not like frills or ruffles. Ms. Porter expressed concern if Jessica were to be left with Linda; she worried that Jessica would be subjected to ridicule, bullied, and not have a place socially. On the other hand, she believed that Jessica would be better off with David because of the change in environment and normalcy he would provide. On cross-examination and questioning by the court, Ms. Porter testified that Jessica acted like a dog during her visit the previous summer. She also testified about their trips to Toys–R–Us, when Jessica directed her to the Olivia playhouse, but not the boys' aisle. Furthermore, she testified to the various concerns Linda had expressed about Jessica's health throughout her life.

Phyllis Frymire, David's mother, testified next. She and her husband live in Madisonville, Kentucky, and she testified about David's affectionate relationship with Jessica. She described Jessica as a happy girl, and she never saw Jessica in any tantrums or rages. Mrs. Frymire recalled taking Jessica to get a bicycle, when Jessica chose a pink and purple model. She also recalled being disturbed by Linda's e-mail. Finally, she testified that Jessica needs a different environment, and that David was a natural caregiver.

Richard Frymire, David's father, was the next witness to testify. Mr. Frymire described Jessica as an active and smart child. He testified that David and Jessica doted on each other, and that Jessica enjoys being a part of the extended Frymire family. Mr. Frymire did not see any tantrums or anxiety on Jessica's part, and did not believe there was a gender issue. Rather, he believed that Jessica did not like frilly clothes.

Donna Beamer, David's girlfriend of three years, also testified regarding the relationship between David and Jessica. She stated that they adored each other. She further testified that she never saw any behavior indicating that Jessica wanted to be a boy.

Dr. Sarah Shelton, a clinical psychologist appointed by the court to perform a forensic custodial evaluation of the parents and child, testified next. The reports of her evaluations were also included as exhibits. The reports reflect that Dr. Shelton examined the available medical records, letters from providers, and court records, and that she interviewed many providers, family members, and others.

Regarding David, Dr. Shelton concluded that he did not have any major mental health diagnosis, other than a pre-existing diagnosis of Attention Deficit Hyperactivity Disorder. She did note his distress about Jessica's well-being and future, but his distress was at an appropriate level. Dr. Shelton deemed him psychologically fit for parenting, stating that his relationship with his daughter was healthy and positive. Regarding Linda, Dr. Shelton noted her pre-existing diagnoses of anorexia nervosa, bulimia nervosa, and bipolar disorder, which Linda reported were under control. Dr. Shelton noted that Linda "seems very invested in Jessica being identified as a boy and treated as a boy by everyone in the child's life, including Mr. Frymire and Jessica's school." Dr. Shelton believed that Linda was "over-responding to the issues she perceives are occurring with Jessica and gender." In conjunction with this, she recognized Linda's history of over-attending to other cues she perceived regarding Jessica's health over her life-

time. Furthermore, Dr. Shelton noted that while Linda did not meet the criteria for Munchausen Syndrome by Proxy, she did share striking similarities with that diagnosis. Finally, regarding Jessica, Dr. Shelton described her as "a bright, imaginative, happy, and well-adjusted child with a delightful personality." Dr. Shelton did not find any support for the diagnosis of gender identity disorder. Rather, Dr. Shelton believed that Jessica's behaviors were common for her developmental age. Dr. Shelton concluded that both parents should have equal input into Jessica's physical and mental health care as well as more frequent contact with her father. Jessica should also be treated with gender neutrality.

During her testimony at the hearing, Dr. Shelton recommended a change in custody, despite the trauma such a change would cause for Jessica. Dr. Shelton stated that it would be less traumatic for her than continuing on the same path. In addition, Dr. Shelton believed Jessica needed a new, neutral therapist.

David's final witness was Dr. Dale Owens, a child clinical psychologist. Dr. Owens performed an independent evaluation of Jessica's medical records at the request of David's attorney. In his opinion, Dr. Owens believed that the medical profession let Jessica down. Regarding art therapist Trina Jansen, Dr. Owens noted that she did not have any expertise in the area of gender identity disorder. Regarding psychologist Dr. Patricia Berne, Dr. Owens noted concerns about her diagnosis based upon the complexity of the disorder and Jessica's young age. Dr. Owens stated that Dr. Berne's interview with Jessica was not diagnostic, but rather was an individual therapy session. Furthermore, Dr. Owens stated that the diagnosis of gender identity disorder cannot be made without several items being accomplished, includ-

ing a psychological evaluation and interview. Regarding Dr. Robin Parks, Dr. Owens noted that she performed a psychological diagnostic interview and did not agree with the diagnosis of gender identity disorder. Rather, she diagnosed a mood disorder and anxiety. Dr. Rosen, he noted, did not make any effort to contact anyone outside of the mother, but used her as the primary source of information. In Dr. Owens' opinion, only Dr. Shelton's reports were objective and thorough.

Once David rested his case, Linda called several witness to testify. First to testify was Steven Tracy, a former neighbor. Linda and Jessica lived with Mr. Tracy and his wife following her separation from David. He admitted to being a little concerned about Linda's ability to care for Jessica. He also testified that after Linda and Jessica moved out of state, Jessica would stay with him and his wife for visits.

Jessica's treating psychologist, Dr. Patricia Berne, testified by telephone. Dr. Berne first saw Jessica on June 7, 2010, and saw her four more times between January and July of 2001. Dr. Berne testified that at the first appointment, she used the projective test of drawing a house, a person, and a tree, as well as self-reporting to diagnose gender identity disorder. In conjunction with this test, Dr. Berne used information she obtained from Linda. From Jessica, Dr. Berne learned that she liked wearing Power Rangers clothing and that she was angry she could not be "Bridge" all of the time. Dr. Berne stated that Jessica spoke through an animal during the first visit. Regarding Linda's role, Dr. Berne recommended that she should affirm Jessica's gender choice and allow her to "be" without any pushing. She also recommended that Jessica start school as a boy. Following the first visit, Dr. Berne sent a letter dated November 28, 2010, to Jessica's school stating her professional

opinion that Jessica had gender identity disorder. On cross-examination, Dr. Berne admitted that gender identity disorders are very rare, stating that only one in 30,000 cases will a female identify as a male. She also admitted that she did not perform any psychological testing or complete a child behavioral checklist. She felt confident in diagnosing gender identity disorder after one visit because gender is innate, in her opinion.

The next individual to testify—at the request of the family court—was Dr. Robin Park, a psychologist. Dr. Park first saw Jessica on November 23, 2010, for complaints of anxiety and depression. Linda shared with Dr. Park that Jessica wanted to wear boy clothes and threw fits if she had to wear girl clothes. Dr. Park diagnosed mood and anxiety disorders, and prescribed Prozac. Dr. Park met with Linda on January 3, 2011, due to Dr. Park's concern of possible sexual abuse. She referred Linda to make an appointment with Holly Carson to evaluate possible abuse. Linda then began canceling all appointments with Dr. Park. When Linda did not return her calls and told her staff that she would not be returning to the office, Dr. Park made a hotline call to report suspected sexual abuse and neglect. Dr. Park also indicated a concern about Munchausen Syndrome by Proxy based upon Linda's over-dramatic reasons given for canceling appointments.

Linda's next witness was Trina Jansen, Jessica's art therapist. Ms. Jansen is a licensed counselor. She first saw Jessica on May 5, 2010, when she presented with anger and gender identity issues, stating that she wanted to be a boy. Jessica appeared at the office in boy clothes and with a boy haircut. Jessica also impersonated a dog during the session. Ms. Jansen diagnosed Jessica with gender identity disorder after the first visit. Because she admittedly had no experience with this disorder, Ms. Jansen referred Linda to Dr. Berne. Ms. Jansen saw Jessica again in July and August. In November, Ms. Jansen sent a letter to Jessica's school district regarding her diagnosis of gender identity disorder, that Linda was planning to have Jessica start kindergarten as a boy, and her recommendation that the school begin making arrangements to accommodate Jessica. Ms. Jansen saw her two more times, in January and May 2011, and her recommendation was to continue to affirm Jessica's gender identity as a boy. During cross-examination, Ms. Jansen admitted that she had never taken any classes regarding gender identity disorder and had no experience with this disorder before diagnosing Jessica. Following the first visit, Ms. Jansen familiarized herself with the disorder through internet research and reading books. She felt this made her qualified to make the diagnosis and write an opinion letter.

Linda testified next. She began her testimony with information related to Jessica's birth and David's failure to help either in the hospital or when they were released. She reported being a nervous mother, was unsure of how to care for the baby, and suffered from post-partum depression. Linda stated that David had a drug and alcohol problem. He came home drunk one night, yelled at the baby as she was crying, and pushed the crib she was in. Linda got the baby and left to stay at the Tracys' house, with whom she had been neighbors in Versailles. She and Jessica stayed with the Tracys for six and one-half months until they got an apartment where they lived for a year. David moved to Murray in March 2006 and did not see his daughter during this time, despite the Tracys welcoming visitation. Linda filed for dissolution, and she was awarded sole custody of Jessica when David failed to appear at the final hearing.

After Linda was laid off from her job with the drug court program, she and Jessica moved back to Illinois to live with her parents in September 2007. They later moved to St. Charles, Missouri, where they still live.

Linda took Jessica to see Ms. Jansen at her parents' urging when she could not get her to wear girl clothes. She stated that the only way to get Jessica to go out in public was to let her wear boy clothes. Ms. Jansen then referred her to Dr. Berne. Dr. Berne recommended that Linda watch a special on the transgender issue, but Linda stated she never watched it. Linda was also referred to pediatric endocrinologist Dr. David Dempsher regarding hormone therapies. She also went to Dr. Park, but the thought of giving Jessica Prozac was scary to her. Linda sought out the opinion of Dr. Rosen when she read Dr. Shelton's report that she did not believe Jessica had gender identity disorder and that the disorder is very rare. Linda also sought support from the Transgendered Youth and Family Advocacy Group.

Throughout her testimony, Linda recounted the difficulties she experienced wrapping her head around the diagnosis of gender identity disorder, thinking that Jessica was just going through a tomboy phase, but was concerned about the high suicide rate that had been reported. She stated that she was doing the best she could for her child by following the recommendations of the medical providers. She was also not opposed to starting over with new providers to determine if Jessica did in fact have gender identity disorder. She was also adamant that she wanted Jessica to have a relationship with David.

Licensed clinical psychologist Dr. Dean Rosen testified by telephone. He began working with transgendered individuals in 1979, and Linda asked him for a second opinion and whether her actions were appropriate. Dr. Rosen saw Jessica on May 23, 2011, and provided a psychological report detailing the visit, his review of other medical records, and his findings. Dr. Rosen concurred in the finding of gender identity disorder, noting that the medical records show repeated statements from Jessica that she is a boy and wants to be called Bridge. On cross-examination, Dr. Rosen admitted that he did not contact David or any of his family members for input, but that he found Linda's history to be credible. He thought that Dr. Berne had a sufficient ability to make the diagnosis of gender identity disorder, and he discounted Dr. Park because of her Christian beliefs. Regarding the diagnosis of gender identity disorder, Dr. Rosen stated that the projective drawing test of the house, tree, and person is not used for diagnostic purposes, but rather to create rapport.

Linda's father, Clay Williams, testified next. He stated that David never visited with Jessica when she and Linda lived with him and his wife in Illinois. He reported that Jessica did not want to talk to her father on the telephone when he would call, but stated this was typical of her with everyone. Mr. Williams noted that Linda was following the providers' recommendations.

David then called Rhonda Diaz on rebuttal. Ms. Diaz works at the childcare center in Calloway County that Jessica attended for a few weeks of that summer. She observed Jessica's mannerisms and how she acted with the other children, and reported nothing out of the ordinary. Ms. Diaz stated that Jessica was well-adjusted and played with both boy and girl toys. She did not note any gender issues, but remembered her being pleasant and funny.

At the conclusion of the hearing, the court permitted the parties to make clos-

ing statements. David requested sole custody, with visitation for Linda, citing his concern that Linda was going from provider to provider. Linda stated that she was following what the providers had been telling her to do. She requested joint custody, with her being named the primary residential custodian. The GAL also recommended joint custody with Linda remaining as the primary residential custodian. In her opinion, it would be detrimental for Jessica to change her primary custodian. The court indicated that it placed much weight in Dr. Shelton's report, but was not impressed by the rest of the providers' testimonies, noting conflicting information and the existence of an agenda.

On August 10, 2011, the family court issued its lengthy findings of fact, conclusion, and judgment. The court determined that it was in Jessica's best interest to modify the current custody arrangement from sole to joint custody and designated David as the residential parent with visitation to Linda pursuant to Schedule A (the Close Proximity schedule). The court found that Linda's assertions regarding Jessica's depression and behavior was not supported by the testimony of David's family or her recent daycare provider. The court gave no weight to Ms. Jansen's diagnosis of gender identity disorder based upon her lack of training or experience, but placed a great deal of weight upon Dr. Shelton's reports and conclusions, noting that she considered independent collateral sources rather than solely relying on Linda's history. The court also relied upon the testimony of Dr. Owen. Regarding Linda, the court specifically stated:

> The Court is not convinced by Linda's statements that she is agreeable to do anything the Court would conclude is in the child's best interest or that she was emotionally distraught over the diagnosis of gender identity disorder or that

she was completely innocent in her acceptance of the mental health professionals' diagnosis. Her actions and conduct contradict her assertions. She had dressed Jessica as a male and cut her hair as a male even prior to taking the child to see the first professional. She contacted a pediatric endocrinologist even though she was advised the child was too young to consider such treatment. She works in the mental health field and should not have been so willing to accept such a diagnosis of such a rare disorder without first questioning the professionals' methodology. When Dr. Park failed to quickly support a diagnosis of gender identity disorder, she refused to continue to work with her and even reported her to the board of ethics and insurance board. Her actions in continuing to dress Jessica in boys' underwear and continuing to seek the services of Dr. Berne, Dr. Rosen, and Dr. Dempsher after Dr. Shelton filed her evaluation clearly do not reflect the actions of a mother distraught over her child being diagnosed with gender identity disorder. It appears odd that a mother distraught over her daughter being diagnosed with gender identity disorder would summarily dismiss the evaluations of Dr. Park and Dr. Shelton.

The court went on to find no evidence to conclude that Linda suffered from Munchausen Syndrome by Proxy, or that David ever had an alcohol or drug abuse problem. Finally, the court concluded that girls can prefer male sports, toys, and clothes without being pathologized as something requiring intervention, such as changing her gender for school, sending her to a separate bathroom, or changing her name to a Power Ranger character. However, the court did not dismiss the possibility that Jessica might or will have gender identity disorder, but noted that

the disorder is extremely rare and that perhaps Jessica just does not like the color pink and prefers boy activities, toys, and clothes. Regarding child support, the court ordered Linda to pay David $660.66 per month effective the date of entry of the order. This appeal by Linda follows.[1]

On appeal, Linda presents two arguments. First, she contends that the family court improperly exercised jurisdiction in this case when it modified custody of a non-resident child and contends Kentucky was an inconvenient forum. Second, if this Court disagrees with her on the jurisdictional issue, Linda argues that the modification order was against the weight of the evidence presented. David, on the other hand, asserts that the family court properly retained jurisdiction and that its ruling was supported by substantial evidence of record.

■ The first issue we shall address is whether the family court properly exercised jurisdiction in this case. In a pretrial order, the family court ruled that it retained exclusive and continuing jurisdiction over the case because David had continued to live in Kentucky and provided a significant connection to the Commonwealth. It also found that Kentucky was not an inconvenient forum to address the issues of custody and visitation modification. "Whether a trial court acts within its jurisdiction is a question of law; therefore, our review is de novo." Biggs v. Biggs, 301 S.W.3d 32, 33 (Ky.App.2009), citing Grange Mut. Ins. Co. v. Trude, 151 S.W.3d 803, 810 (Ky.2004).

In KRS 403.824, the General Assembly addressed the concept of continuing jurisdiction in child custody matters:

(1) Except as otherwise provided in KRS 403.828, a court of this state which has made a child custody determination consistent with KRS 403.822 or 403.826 has exclusive, continuing jurisdiction over the determination until:

(a) A court of this state determines that neither the child, nor the child and one (1) parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships; or

(b) A court of this state or a court of another state determines that the child, the child's parents, and any other person acting as a parent do not presently reside in this state.

(2) A court of this state which has made a child custody determination and does not have exclusive, continuing jurisdiction under this section may modify that determination only if it has jurisdiction to make an initial determination under KRS 403.822.

This Court addressed the application of KRS 403.824 in Wallace v. Wallace, 224 S.W.3d 587, 590 (Ky.App.2007), explaining:

The concept of continuing jurisdiction incorporated into the UCCJEA was adopted by Kentucky and is contained in KRS 403.824[.] . . .

1. David moved to alter, amend, or vacate the order regarding allocation of the GAL fees and to provide for visitation according to Schedule B for long distance proximity. In response, Linda did not contest the change to the GAL fee allocation, but requested that her monthly support obligation be changed to reflect the medical and dental insurance premiums she paid. She also requested that the visitation schedule be left as-is. On September 1, 2011, the court granted the motion in part, changing Linda's monthly child support obligation to $636.30 per month as well as the split in the GAL fees. The court did not change the visitation schedule. Linda did not raise any of the issues addressed in the post-judgment motion or ruling in her appellate brief.

Thus, the state having original jurisdiction over custody maintains exclusive continuing jurisdiction though the child has acquired a new home state if the general requirement of the substantial connection jurisdictional provisions are met. As stated by the court in *Ruth v. Ruth*, 32 Kan.App.2d 416, 421, 83 P.3d 1248, 1254 (2004), exclusive, continuing jurisdiction prevails under the UCCJEA until the "relationship between the child and the person remaining in the state with exclusive, continuing jurisdiction becomes so attenuated that a court could no longer find significant connections and substantial evidence."

Linda argues that no significant connections exist between Jessica and Kentucky and that there is no longer any substantial evidence in Kentucky regarding Jessica's care, protection, training, or personal relationships. In conjunction with this argument, Linda asserts that the Calloway Family Court cannot have continuing jurisdiction over the case because it did not decide the original custody issue; rather, the original custody decree was issued by the Fayette Family Court, where the dissolution action was filed. This argument is not well-taken. The Court in *Biggs* made it clear that "the *state* making an initial custody determination retains jurisdiction unless" the factors set forth in KRS 403.824(1) related to lack of significant contacts are met. *Biggs*, 301 S.W.3d at 33 (emphasis added).

Our review of the record confirms that both Jessica and David maintained significant connections with Kentucky. There is no question that David has lived in Kentucky his whole life, and has worked and lived in Calloway County for several years. While Jessica no longer lives in Kentucky, but in Missouri, she maintains a significant connection with Kentucky through visits with her father and her father's family

members. In addition, Jessica continues to visit with the Tracys in Versailles. Furthermore, there is substantial evidence in Kentucky related to Jessica's care, protection, training, and personal relationships, specifically through David's family and her daycare provider while she was with David. Accordingly, we hold that Kentucky retained exclusive, continuing jurisdiction over this case. But this holding does not end our inquiry.

■ We now turn our attention to KRS 403.834, which provides that a court may decline to exercise its jurisdiction if it is an inconvenient forum:

(1) A court of this state which has jurisdiction under KRS 403.800 to 403.880 to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum. The issue of inconvenient forum may be raised upon motion of a party, the court's own motion, or request of another court.

(2) Before determining whether it is an inconvenient forum, a court of this state shall consider whether it is appropriate for a court of another state to exercise jurisdiction. For this purpose, the court shall allow the parties to submit information and shall consider all relevant factors, including:

(a) Whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child;

(b) The length of time the child has resided outside this state;

(c) The distance between the court in this state and the court in the state that would assume jurisdiction;

(d) The relative financial circumstances of the parties;

(e) Any agreement of the parties as to which state should assume jurisdiction;

(f) The nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

(g) The ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and

(h) The familiarity of the court of each state with the facts and issues in the pending litigation.

(3) If a court of this state determines that it is an inconvenient forum and that a court of another state is a more appropriate forum, it shall stay the proceedings upon condition that a child custody proceeding be promptly commenced in another designated state and may impose any other condition the court considers just and proper.

(4) A court of this state may decline to exercise its jurisdiction under KRS 403.800 to 403.880 if a child custody determination is incidental to an action for divorce or another proceeding while still retaining jurisdiction over the divorce or other proceeding.

Regarding the attempted exercise of jurisdiction by another state, "[o]ur Supreme Court has recently held that a new state may not exercise jurisdiction for purposes of custody unless a Kentucky court first determines that the new state would be a more convenient forum according to the factors listed in KRS 403.834." *Biggs,* 301 S.W.3d at 34, citing *Mauldin v. Bearden,* 293 S.W.3d 392, 401 (Ky.2009). No action had been filed in another state related to Jessica's custody.

The family court indicated that it considered all of the necessary factors set forth in KRS 403.834(2) in determining that it was not an inconvenient forum, and we agree with this conclusion. In support of her argument that Missouri is a better forum to hear this case, Linda states that Jessica's medical providers are located in Missouri, not Kentucky. On the other hand, David points out that no lay witnesses were located in Missouri; rather, those witnesses were in Kentucky or Illinois (Linda's parents live in Illinois). All of these witnesses, including Jessica's daycare provider, were able to testify live in the courtroom, and the family court permitted telephonic testimony for the medical providers located in Missouri. Based upon the factors set forth in KRS 403.834(2), we hold that the family court did not abuse its discretion in retaining jurisdiction over this case.

■ Because we have held that the family court properly retained jurisdiction, we shall now consider Linda's second argument that the family court's decision to modify the original custody decree to name David as the residential parent was against the weight of the evidence and not in Jessica's best interest.[2] We agree with David that the family court's decision to name him as the residential parent did not constitute an abuse of discretion based on the evidence presented.

■ An appellate court's standard of review in the area of child custody is well-settled in this Commonwealth. "The party seeking modification of custody or visitation/timesharing is the party who has the burden of bringing the motion before the court" and "the change of custody motion or modification of visitation/timesharing

---

**2.** As David points out in his brief, the parties agreed to a change in custody from sole to joint at the beginning of the modification

hearing, so we shall confine our review to the propriety of the family court's designation of David as the residential parent.

must be decided in the sound discretion of the trial court." *Pennington v. Marcum,* 266 S.W.3d 759, 769 (Ky.2008). KRS 403.320(3) provides for the modification of custody "upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of entry of the prior decree, that a change has occurred in the circumstances of the child or his custodian, and that the modification is necessary to serve the best interests of the child."

KRS 403.340(3) sets forth several factors for a court to consider in determining whether to modify a prior custody decree, including:

(a) Whether the custodian agrees to the modification;

(b) Whether the child has been integrated into the family of the petitioner with consent of the custodian;

(c) The factors set forth in KRS 403.270(2) to determine the best interests of the child;

(d) Whether the child's present environment endangers seriously his physical, mental, moral, or emotional health;

(e) Whether the harm likely to be caused by a change of environment is outweighed by its advantages to him; and

(f) Whether the custodian has placed the child with a de facto custodian.

KRS 403.270(2), in turn provides a list of all relevant factors a court must consider in order to decide what is in the best interests of the child:

(a) The wishes of the child's parent or parents, and any de facto custodian, as to his custody;

(b) The wishes of the child as to his custodian;

(c) The interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;

(d) The child's adjustment to his home, school, and community;

(e) The mental and physical health of all individuals involved;

(f) Information, records, and evidence of domestic violence as defined in KRS 403.720;

(g) The extent to which the child has been cared for, nurtured, and supported by any de facto custodian;

(h) The intent of the parent or parents in placing the child with a de facto custodian; and

(i) The circumstances under which the child was placed or allowed to remain in the custody of a de facto custodian, including whether the parent now seeking custody was previously prevented from doing so as a result of domestic violence as defined in KRS 403.720 and whether the child was placed with a de facto custodian to allow the parent now seeking custody to seek employment, work, or attend school.

Regarding the best interests standard, "any factual findings are reviewed under the clearly erroneous standard; any decisions based upon said facts are reviewed under an abuse of discretion standard." *Young v. Holmes,* 295 S.W.3d 144, 146 (Ky.App.2009).

The crux of Linda's argument is that she is being penalized for following the medical advice given to her by Jessica's providers related to her diagnosis of gender identity disorder. We must agree with Dr. Owens' statement that the medical profession certainly let Jessica down. While we make no judgment about the diagnosis of gender identity disorder or whether Jessica has this disorder, the medical witnesses Linda presented at the hearing did nothing to establish that Jessica was properly diag-

nosed or that Linda was receiving or following competent medical advice. Ms. Jansen was wholly unsuited and unqualified to make this rare diagnosis, and Dr. Berne made the diagnosis after a brief first session relying on a test that is not used to diagnose gender identity disorder. Furthermore, Dr. Rosen continued to support Dr. Berne's diagnosis and treatment even after discounting the test that she used. The only objective medical witnesses presented were Dr. Shelton, who was appointed by the court, and Dr. Owens. They both discounted the opinions of Jessica's providers and instead used a wide range of reports and interviews to reach their own conclusions that Jessica should not have been diagnosed with gender identity disorder.

The family court very cogently expressed its reasoning for not believing that Linda was completely innocent in her acceptance of the medical providers' advice, or that she would be agreeable to what the court might direct her to do with regard to Jessica's best interests. In fact, the record reflects that Linda tended to reject any challenge to the diagnosis of gender identity disorder, dismissing the medical opinions of both Dr. Park and Dr. Shelton. The record also reflects Linda's history of seeking out diagnoses for Jessica from before she was even a year old. The court's findings related both to Linda's behavior, including her actions in dressing Jessica in boy clothing and giving her a boy haircut prior to visiting the first provider to diagnose her, as well as to Jessica's preferences, provide sufficient support for the decision that it would be in Jessica's best interest to name David as the residential parent, despite the trauma the change in custody would cause. We perceive no abuse of discretion in this decision.

For the foregoing reasons, the judgment of the Calloway Family Court modifying custody is affirmed.

ALL CONCUR.